[Cite as *Lyon v. Riverside Methodist Hosp.*, 2025-Ohio-2991.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Susana Lyon,                                     :

      Plaintiff-Appellee,               :              No. 23AP-379
                                                          (C.P.C. No. 16CV-12056)

v.                                               :

                                                                (ACCELERATED CALENDAR)
Riverside Methodist Hospital et al.,             :

      Defendants-Appellants.            :

D E C I S I O N

Rendered on August 21, 2025

**On brief:** *Colley Shroyer & Abraham Co. LPA, David I. Shroyer*, and *Tyler B. Shroyer*, for appellee.
**Argued:** *David I. Shroyer*.

**On brief:** *Reminger Co., L.P.A., Brian D. Sullivan, Brianna M. Prislipsky, David H. Krause*, and *Jackie M. Jewell*, for appellants.
**Argued:** *Brian D. Sullivan*.

**On brief:** *Bricker Graydon LLP*, *Karen L. Clause*, and *Anne Marie Sferra*, for Amici Curiae, Ohio Hospital Association, Ohio Alliance for Civil Justice, Ohio State Medical Association, and Ohio Osteopathic Association.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendants-appellants, Raghuram Reddy, M.D., Ryan Gaible, M.D., Rohit Makkar, M.D., and Ohio Gastroenterology Group, Inc., appeal from both a May 31, 2023 final judgment entry, and a decision and order granting the motion of plaintiff-appellee, Susana Lyon, to declare the noneconomic damages cap in R.C. 2323.43 unconstitutional. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   On or about May 27, 2015, Lyon presented at Lower Lights Christian Health Center ("Lower Lights") with a history of GERD and tachycardia.  In October 2015, Lyon presented again at Lower Lights with complaints of gastroparesis.  Lyon had lost over 30 pounds since her last visit.  On November 24, 2015, Lyon presented to the Riverside Methodist Hospital ("Riverside"), reporting that she had not been able to keep water down for several days as well as intractable vomiting with nausea for several weeks.  Lyon reported that she had been in and out of the emergency department for two months where she would receive IV fluids and then feel better.  Lyon was discharged on December 7, 2015.  Lyon was readmitted to Riverside two days later with persistent nausea and positional vertigo with spinning, as well as diplopia and blurred vision.  Lyon was discharged on December 15, 2015. On or about December 21, 2025, Lyon was again admitted to Riverside then discharged two days later.  On January 15, 2016, Lyon was admitted to the Ohio State University Wexner Medical Center where she was diagnosed with severe nutritional deficiency and Wernicke-Korsakoff syndrome, which led to severe peripheral neuropathy.

{¶ 3}   On December 21, 2016, Lyon filed a complaint for medical negligence due to a failure to diagnose a thiamine deficiency, which resulted in Wernicke-Korsakoff syndrome and severe neurologic injury.  The complaint alleged dozens of defendants had rendered negligent medical care.  A first and second amended complaint were filed on January 13, 2017 and January 23, 2019, respectively.

{¶ 4}   During the life of the case, all the defendants, excluding the appellants, either settled or were dismissed.  The remaining parties proceeded to a jury trial.  On April 20, 2023, the jury rendered its verdict in favor of Lyon and awarded damages of $25,172,526.32.  The damages were broken down as follows:

Economic Damages:
Past Medical Care/Expenses: $744,157.32
Future Medical Expenses: $4,428,369.00

Non-Economic Damages:
Past Non-Economic Damages: $5,000,000.00
Future Non-Economic Damages: $15,000,000.00

(Verdict Forms and Interrogatory No. 10.)

{¶ 5} The jury also determined that Makkar, Reddy, and Gaible were each 3 percent responsible for Lyon's injuries and damages while Ohio Gastroenterology Group, Inc. was jointly liable for 9 percent. (May 31, 2023 Jgmt. Entry.)

{¶ 6} On April 28, 2023, the appellants filed a motion to journalize the jury's verdict in conformance with the $500,000 noneconomic damages cap under R.C. 2323.43(A)(3). The appellants sought to have the trial court enter judgment consistent with the jury's findings and R.C. 2323.43, which set forth a mandatory cap on noneconomic damages for all medical claims. On May 1, 2023, Lyon filed a motion to declare the damages cap in R.C. 2323.43 unconstitutional, on its face and as applied to her case, as it violated her right to due process, equal protection, trial by jury, and was unconstitutionally vague. On May 11, 2023, Lyon filed a memorandum in opposition to the appellants' motion to journalize the jury's verdict in conformance with R.C. 2323.43. The appellants filed a memorandum in opposition to Lyon's motion on May 15, 2023.

{¶ 7} On May 31, 2023, the trial court denied the appellants' motion and granted Lyon's motion to declare the damages caps unconstitutional. The trial court found the noneconomic damages cap in R.C. 2323.43 unconstitutional as it violated both Lyon's right to due process and equal protection. The trial court, however, rejected Lyon's argument that the statute violated her right to a trial by jury or that it was unconstitutionally vague. (May 31, 2023 Decision and Order at 2.) A judgment entry reflecting the jury's verdict and damages was filed on May 31, 2023.

{¶ 8} On June 13, 2023, Lyon filed a motion for prejudgment interest with the trial court. On June 26, 2023, the appellants filed a notice of appeal. On July 3, 2023, Lyon filed with this court a motion to remand this matter back to the trial court for consideration of the outstanding motion for prejudgment interest, which we granted. On July 12, 2023, the appellants filed a motion for reconsideration of the decision. On July 13, 2023, we denied the motion for reconsideration and the matter was remanded to the trial court. On October 4, 2023, Lyon filed a notice of withdrawal of her motion for prejudgment interest.

On October 18, 2023, the appellants filed a motion to reactivate this appeal, which we granted.

## II. ASSIGNMENT OF ERROR

{¶ 9} The appellants assign the following as trial court error:

> The trial court erred in declaring R.C. 2323.43, the medical claim damage cap statute, unconstitutional.

## III. STANDARD OF REVIEW

{¶ 10} There is a presumption of constitutionality with all statutes. *Kennedy v. W. Res. Senior Care*, 2024-Ohio-5565, ¶ 8, citing *State v. Boczar*, 2007-Ohio-1251, ¶ 9. " 'It is difficult to prove that a statute is unconstitutional.' " *Rowitz v. McClain*, 2019-Ohio-5438, ¶ 15 (10th Dist.), quoting *Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 25. The party challenging the constitutionality of the statute bears the burden of proving otherwise. *Kennedy* at ¶ 8, citing *Boczar* at ¶ 9. A party seeking constitutional review of a statute may proceed in two ways: (1) a facial challenge to the statute as a whole or (2) a challenge to the statute as applied to the specific facts of the case. *Rowitz* at ¶ 16, citing *Arbino* at ¶ 26, citing *Harrold v. Collier*, 2005-Ohio-5334, ¶ 37. To succeed under a facial challenge, "the party must prove beyond a reasonable doubt that there exists no set of circumstances under which the statute would be valid." (Internal quotation marks deleted and citation omitted.) *Brandt v. Pompa*, 2022-Ohio-4525, ¶ 79. " 'The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid.' " *Moe v. Yost*, 2025-Ohio-914, ¶ 43 (10th Dist.), quoting *Harrold* at ¶ 37, citing *United States v. Salerno*, 481 U.S. 739, 745 (1987). If a statute is determined to be unconstitutional on its face, it may not be enforced under any circumstances. *Moe* at ¶ 43, citing *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 21. When reviewing an as-applied challenge, the moving party must demonstrate by clear and convincing evidence that the statute is unconstitutional when applied to the existing set of facts. *Brandt* at ¶ 79, citing *Harrold* at ¶ 38.

{¶ 11} Here, Lyon asserted both a facial and an as-applied challenge to the constitutionality of R.C. 2323.43. " 'Whether a statute is constitutional is a question of law that we review de novo.' " *Kennedy* at ¶ 8, quoting *Portage Cty. Educators Assn. for Dev. Disabilities-Unit B, OEA/NEA v. State Empl. Relations Bd.*, 2022-Ohio-3167, ¶ 7.

## IV. LEGAL ANALYSIS

### A. Appellants' Sole Assignment of Error

{¶ 12} The sole assignment of error concerns whether the trial court erred by declaring R.C. 2323.43(A)(3) unconstitutional.

### 1. Legislative History of Noneconomic Damages Caps and the Supreme Court of Ohio

{¶ 13} In 1975, the General Assembly enacted Am.Sub.H.B. No. 682 ("H.B. 682") in an effort to "combat a perceived malpractice-insurance crisis." *Arbino* at ¶ 11. The statute placed a $200,000 cap on damages in medical negligence cases not involving death. H.B. 682 provided no exceptions for those suffering severe injuries. *See Morris v. Savoy*, 61 Ohio St.3d 684 (1991). In *Morris*, the Supreme Court of Ohio considered the constitutionality of the $200,000 noneconomic damages cap under H.B. 682. *Id.* at 691. In a decision written by Justice Wright, the *Morris* court found the statute unconstitutional on due process grounds writing, "[i]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice." *Id.*

{¶ 14} The General Assembly went on to enact the Tort Reform Act of 1987, Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661 ("H.B. 1"). The statute sought to remedy "another 'insurance crisis' " by changing "civil-justice and insurance law." *Arbino* at ¶ 13. Again, the Supreme Court found the legislator's efforts at tort reform were unconstitutional, this time finding that the "mandatory deduction of collateral benefits violated the right to a jury trial, due process, equal protection, and the right to a remedy." *Arbino* at ¶ 14, citing *Sorrell v. Thevenir*, 69 Ohio St.3d 415, 418 (1994), syllabus. *See also Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552 (1994), paragraph two of the syllabus (finding a provision of H.B. 1, former R.C. 2315.21(C)(2), which required a trial court judge to determine the amount of punitive damages to be awarded in a tort claim, even when the trier of fact is the jury, unconstitutional as a violation of the right to a jury trial). In *Galayada v. Lake Hosp. Sys., Inc.*, 71 Ohio St.3d 421 (1994), the Supreme Court considered the constitutionality of former R.C. 2323.57, which directed a trial court to order awards of future damages that exceeded $200,000 in medical malpractice claims to be paid over periodic payments upon motion of any party. The *Galayada* court found former R.C. 2323.57 unconstitutional as a violation of the right to a jury trial and on due process grounds.

{¶ 15} In 1997, the General Assembly enacted Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867 ("H.B. 350"). The legislature "amended, enacted, or repealed over 100 sections of the Revised Code contained in 18 titles and 38 chapters." *Arbino* at ¶ 17. Among the reforms, H.B. 350 established caps on noneconomic damages. The Supreme Court considered the constitutionality of the entire bill in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451 (1999). The *Sheward* court found H.B. 350 unconstitutional in toto as it violated the separation of powers and single-subject clause of the Ohio Constitution. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451 (1999), paragraphs two and three of the syllabus. While later deemed dicta, *see Arbino* at ¶ 52, the *Sheward* court restated language from *Morris*, which provided, "like former R.C. 2307.43, R.C. 2323.54 is invalid on due process grounds because it is unreasonable and arbitrary, irrespective of whether it bears a real and substantial relation to public health or welfare." *Id*. at 490.

{¶ 16} Undeterred, the General Assembly enacted Am.Sub.S.B. No. 80, Section 3(A)(1) ("S.B. 80"). A portion of S.B. 80, R.C. 2325.18, imposed a cap of "(1) $250,000 or (2) three times the economic damages up to a maximum of $350,000, or $500,000 per single occurrence" on noneconomic damages. *Arbino* at ¶ 28. The statute did not place a cap on damages for those that suffered catastrophic injuries. *Id*. In *Arbino*, the Supreme Court considered a facial challenge to R.C. 2315.18. The Supreme Court upheld the statute finding that while it had struck down prior damages cap statutes, R.C. 2325.18 alleviated "this concern by allowing for limitless noneconomic damages for those suffering catastrophic injures." *Id*. at ¶ 60. The *Arbino* court went on to explain that "catastrophic injuries offer more concrete evidence of noneconomic damages and thus calculation of those damages poses a lesser risk of being tainted by improper external considerations." *Id*. at ¶ 72.

{¶ 17} In *Simpkins v. Grace Brethren Church of Delaware, Ohio*, 2016-Ohio-8118, the Supreme Court considered several constitutional challenges to the noneconomic damages cap in R.C. 2315.18(B)(2) as applied to victims of sexual assault as minors. Relevant to the present case, a plurality of the court concluded that R.C. 2315.18(B) was constitutional writing, "[a]lthough damages awarded to minors who are victims of sexual assault may be unlikely to qualify for an exception to the application of the noneconomic-damage caps, the General Assembly's policy decision to exclude from the damage caps only

those awards to plaintiffs who suffer catastrophic *physical* damages does not place upon Simpkins and those similarly situated an undue portion of the cost of ameliorating the deleterious economic effects of the tort system, as the damage cap in *Morris* did." (Emphasis in original.) *Id.* at ¶ 40. In *Brandt v. Pompa*, 2022-Ohio-4525, the Supreme Court considered an as-applied challenge to R.C. 2315.18 on due process grounds for psychological injuries the plaintiff sustained from repeated sexual abuse as a minor. The *Brandt* court, consistent with its prior decisions, found the cap on Brandt's noneconomic damages under R.C. 2315.18 unconstitutional "*to the extent that it fails to include an exception to its compensatory-damages caps for nonec*onomic *loss for plaintiffs who have suffered permanent and severe psychological injuries.*" (Emphasis in original.) *Brandt* at ¶ 46.

{¶ 18} On April 11, 2003, the General Assembly enacted Am.Sub.S.B. No. 281 ("S.B. 281"). As part of S.B. 281, the legislator created R.C. 2323.43, which established caps on noneconomic damages[1] for medical claims. In relevant part, R.C. 2323.43 provides:

> (2) Except as otherwise provided in division (A)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a civil action under this section to recover damages for injury, death, or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the plaintiff's economic loss, as determined by the trier of fact, to a maximum of three hundred fifty thousand dollars for each plaintiff or a maximum of five hundred thousand dollars for each occurrence.
>
> (3) The amount recoverable for noneconomic loss in a civil action under this section may exceed the amount described in division (A)(2) of this section but shall not exceed five hundred thousand dollars for each plaintiff or one million dollars for each occurrence if the noneconomic losses of the plaintiff are for either of the following:
>
> (a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;
>
> (b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities.

---

[1] The General Assembly defined "noneconomic loss" in R.C. 2323.43(H)(3) as follows:
[N]onpecuniary harm that results from an injury, death, or loss to person or property that is a subject of a civil action upon a medical, dental, optometric, or chiropractic claim, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss.

R.C. 2323.43(A)(2) through (3)(b).

{¶ 19} Stated another way, the legislator created a two-tiered system through R.C. 2323.43, which imposed a cap on the award of noneconomic damages for medical negligence claims based on the severity of the injury. Under the first tier, noneconomic damages were capped at the greater of $250,000, "or an amount that is equal to three times the plaintiff's economic loss," with a maximum recovery of $350,000. R.C. 2323.43(A)(2). Under the second tier, the amount recoverable increased to $500,000 if the plaintiff can establish that they sustained "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life sustaining activities." R.C. 2323.43(A)(3)(a) through (b).

### 2. Rational Basis v. Strict Scrutiny

{¶ 20} Ohio courts review the constitutionality of a statute using the rational-basis test unless it concerns the exercise of a fundamental right or suspect class. *See, e.g.*, *Morris*, 61 Ohio St.3d 684 at 689. Under the rational-basis test, R.C. 2323.43 must be upheld if it "[1] bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary." (Brackets in original.) (Internal quotation marks deleted and citation omitted.) *Arbino*, 2007-Ohio-6948, at ¶ 49. R.C. 2323.43 does not concern a fundamental right or a suspect class and, therefore, is not entitled to strict scrutiny. *Paganini v. Cataract Eye Ctr. of Cleveland*, 2025-Ohio-275, ¶ 53 (8th Dist.). As such, we will review, under both a facial and as-applied challenge, whether R.C. 2323.43 comports with the constitutional guarantees under the due course of law and equal protection provisions using the rational-basis test.

### 3. Due Process Violation

{¶ 21} Article I, Section 16 of the Ohio Constitution guarantees "every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." The "due course of law" provision is the Ohio equivalent to the Due Process Clause in the United States Constitution. *Arbino* at ¶ 48, citing *Sorrell*, 69 Ohio St.3d at 422-423; *see also Paganini* at ¶ 52, citing *Direct Plumbing Supply Co. v. Dayton*, 138 Ohio St. 540, 544 (1941).

### a. Real and Substantial Relation to the Public Health, Safety, Morals or General Welfare of the Public

{¶ 22} When considering whether R.C. 2323.43(A)(3) has a real and substantial relationship to the public health, safety, morals, or general welfare of the public, the appellants cite the legislative record noting the various economic factors that influenced its enactment. The appellants contend "[d]amage caps help mitigate these public interest concerns by providing a reasonable level of compensation while also protecting the viability of the medical profession." (Appellants' Brief at 17.) The appellants go on to cite a 2002 American Medical Association news release that identified Ohio as 1 of 12 states that faced a medical liability crisis that threatened access to healthcare. *AMA Analysis: A Dozen States in Medical Liability Crisis*, American Medical Association News Release (June 17, 2002). (Appellants' Brief at 17.)

{¶ 23} Upon review, the General Assembly provided meaningful findings and statements of intent within the editor's notes of R.C. 2323.43. The legislature found that medical malpractice litigation represented a growing danger to the availability and quality of healthcare in Ohio. R.C. 2323.43, Editor's Notes § 3(A)(1). While the number of medical malpractice claims resulting in payments to plaintiffs has remained steady, the average award to plaintiffs has dramatically increased. *Id.* at § 3(A)(2). By way of example, the General Assembly noted that payments to plaintiffs at or exceeding $1 million have doubled in the last three years. "This state has a rational and legitimate state interest in stabilizing the cost of health care delivery by limiting the amount of compensatory damages representing noneconomic loss awards in medical malpractice actions. The overall cost of health care to the consumer has been driven up by the fact that malpractice litigation causes health care providers to over prescribe, over treat, and over test their patients." *Id.* at § 3(A)(3). The legislature provided that "[m]any medical malpractice insurers left the Ohio market as they faced increasing losses, largely as a consequence of rapidly rising compensatory damages and noneconomic loss awards in medical malpractice actions. The Department of Insurance reports that only six admitted carriers continue to actively write coverage in Ohio at this time." *Id.* at § 3(A)(3)(b). The General Assembly found that physicians, hospitals, and other healthcare professionals have consequently had a tougher time finding affordable medical malpractice insurance. "The Ohio State Medical Association reports fifteen per cent of Ohio's physicians are considering or have already

relocated their practices due to rising medical malpractice insurance costs." *Id.* at § (3)(A)(3)(c). To combat these problems, the legislator cited a 2002 study from the U.S. Department of Health and Human Services that found "health care practitioners in states with effective caps on noneconomic damages are experiencing premium increases in the twelve to fifteen per cent range, as compared to an average forty-four per cent increase in states that do not cap noneconomic damage awards." *Id.* at § (3)(A)(3)(e). The legislature explained that the cap amounts in the statute are based on testimony that similar caps have been adopted by other states. *Id.* at § 3(A)(4)(b). "The distinction among claimants with a permanent physical functional loss strikes a reasonable balance between potential plaintiffs and defendants in consideration of the intent of an award for noneconomic losses, while treating similar plaintiffs equally, acknowledging that such distinctions do not limit the award of actual economic damages." *Id.* at § 3(A)(4)(a). Finally, the legislature noted that the caps do not affect the award of economic damages such as lost wages or medical care. *Id.* at § 3(A)(5).

{¶ 24} In *Arbino*, the Supreme Court reviewed similar legislative findings concerning R.C. 2315.18 and found that, as a whole, the damage caps at issue in that case bore a real and substantial relation to the public general welfare. The *Arbino* court explained:

> The General Assembly reviewed evidence demonstrating that uncertainty related to the existing civil litigation system and rising costs associated with it were harming the economy. It noted that noneconomic damages are inherently subjective and thus easily tainted by irrelevant considerations. The implicit, logical conclusion is that the uncertain and subjective system of evaluating noneconomic damages was contributing to the deleterious economic effects of the tort system.

*Arbino* at ¶ 55.

{¶ 25} In her dissenting opinion in *Brandt*, then Justice Kennedy wrote that the General Assembly observed, "[i]t is these inflated noneconomic-damages awards that contributed to the problems in our civil-justice system." *Brandt* at ¶ 60 (Kennedy, J., dissenting). While recognizing that R.C. 2315.18 does not have a noneconomic damages cap on catastrophic injuries, the Supreme Court's general reasoning can be applied to R.C. 2323.43. The legislator has identified an apparent problem with the increased danger to the availability and quality of healthcare in Ohio and enacted the noneconomic damages

cap to medical malpractice claims as part of the solution.[2]  As discussed in the subsequent section, while our concerns regarding the $500,000 cap as-applied to Lyon is a different matter, under the first prong of the rational-basis test, we are not tasked with second-guessing the legislature's conclusions.  "A fundamental principle of the constitutional separation of powers among the three branches of government is that the legislative branch is 'the ultimate arbiter of public policy.' "  *Arbino* at ¶ 21, quoting *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network v. Dupuis*, 2002-Ohio-7041, ¶ 21.

{¶ 26}  To be sure, we have grappled with language from Justice Pfeifer's dissent in *Arbino*, which stated:

> There is no rational reason to "improve" the tort system in Ohio at the sole expense of a small group of people who are able to prove that they suffered damage significant enough to exceed the damages caps imposed by the General Assembly. Whatever improvement the tort system in Ohio needs, the Ohio Constitution should remain inviolate, unless properly amended.

*Arbino* at ¶ 185 (Pfeifer, J., dissenting.)

{¶ 27}  However, the legislature has set out legitimate concerns regarding the rising cost of medical liability insurance premiums and related costs.  As pointed out in *Arbino*, the fact that the General Assembly has continually sought to reform some aspect of the civil tort system for now 50 years demonstrates the continuing prevalence of this issue.  *Id*. at ¶ 21.  Given the General Assembly's rationale for enacting the statute, R.C. 2323.43 bears a real and substantial relationship to the general welfare of the public.

{¶ 28}  Lyon contends that there are existing mechanisms, including Civ.R. 10(D)(2) (requiring an affidavit of merit for medical claims); R.C. 2315.19 (providing the trial court, upon a post-judgment motion, an avenue to review compensatory damages for noneconomic loss in a tort claim that the defendant challenged as excessive); and Civ.R. 59(B) (permitting the filing of a motion for remittitur to address an excessive verdict that limits claims against physicians) to protect physicians against frivolous claims and combat

---

[2] One legal scholar, however, has indicated that the national tort reform debate has shifted to a discussion of whether a medical malpractice crisis ever existed. "Missouri found that its tort reform was likely to have disproportionately burdened the young, the economically disadvantaged, and those who were most severely injured. These classes of plaintiffs are unlikely to have the means to pay the upfront costs of bringing a colorable claim for personal injury. Despite these findings, compensatory damage caps remain the rule rather than the exception among states." Shaakirrah R. Sanders, *Deconstructing Juryless Fact-Finding in Civil Cases*, 25 Wm. & Mary Bill Rts. J. 235, 238 (2016). Regardless, for the purposes of our review, we are required to accept the General Assembly's conclusions otherwise.

the excessive jury awards. (Appellee's Brief at 30.) However, the legislature is permitted to take more than one avenue to combat a problem. The General Assembly has presented evidence that connects caps on noneconomic damages from medical negligence claims to address rising healthcare costs and the quality of medical care. It is not the role of this court to reexamine the evidence presented by the General Assembly. "[W]e are to grant substantial deference to the predictive judgment of the General Assembly under the rational-basis review . . . it is not the function of the courts to substitute their evaluation of legislative facts for that of the legislature." (Internal quotation marks deleted and citation omitted.) *Arbino* at ¶ 58. Thus, the first prong is satisfied as there is a real and substantial relation to the public health, safety, morals, or general welfare of the public by including a cap on noneconomic damages for catastrophic injuries.

### b. Whether the Cap on Noneconomic Damages for Catastrophic Injuries in Medical Malpractice Cases is Not Unreasonable or Arbitrary.

{¶ 29} Turning to the second prong in our analysis, we must consider whether the $500,000 cap for noneconomic damages in medical malpractice cases is unreasonable or arbitrary. The General Assembly provided some discussion as to how it arrived at the monetary figures for each tier of noneconomic damages. Of note, the legislator found, "[t]he number of medical malpractice claims resulting in payments to plaintiffs has remained relatively constant. However, the average award to plaintiffs has risen dramatically. Payments to plaintiffs at or exceeding $1 million have doubled in the past three years." R.C. 2323.43(A)(2), Editor's Notes § 3(A)(2). However, it is unclear whether these increased awards are based on noneconomic damages or whether the overall awards, economic and noneconomic alike, are becoming more expensive. Slightly more instructive, the General Assembly noted that the cap amounts are based on testimony asking the legislator to recognize these distinctions explaining that similar cap amounts have been adopted by other states. R.C. 2323.43, Editor's Notes § 3(A)(4)(b). The General Assembly provided:

> A report from the U.S. Department of Health and Human Services, *Update on the Medical Litigation Crisis: Not the Result of the Insurance Cycle* (Sept. 25, 2002), states that among states that have adopted a two hundred fifty thousand dollar cap on noneconomic damages are: Indiana, Colorado, California, Nebraska, Utah, and Montana. These states, as well as others that have imposed meaningful caps on noneconomic damages, report significantly lower increases in average premium rates than those states

without caps. Limits on damages have been upheld by other state supreme courts, as in *Fein v. Permanente Medical Group* (1985), 38 Cal.3d 137, 695 P.2d 665, *Johnson v. St. Vincent Hospital, Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585, and, *Evans v. State*, [56 P.3d 1046 (Alaska 2002)].

R.C. 2323.43, Editor's Notes § 3(A)(4)(d).

{¶ 30} Given the cap at issue is double what other states offer for noneconomic injuries, we cannot find, beyond doubt, that the figure is unreasonable or arbitrary. " 'The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid.' " *Arbino* at ¶ 26, quoting *Harrold*, 2005-Ohio-5334, at ¶ 37. To be sure, language from *Morris* and *Arbino* note the Supreme Court's concern with caps involving catastrophic injuries. Given the available information, "[a]t some point, though, the General Assembly must be able to make a policy decision to achieve a public good." *Id.* at ¶ 61. We can envision a scenario where the noneconomic damages are close to the $500,000 cap such that a minimal reduction would be reasonable and not arbitrary to curtail the rising costs of healthcare to benefit the general public. As such, under a facial challenge, we cannot say beyond doubt that the cap on catastrophic injuries for medical malpractice is unreasonable or arbitrary.

{¶ 31} As applied to the instant case, however, we find a reduction in Lyon's noneconomic damages is clearly and convincingly unreasonable and arbitrary. We are persuaded by the Eighth District Court of Appeals' analysis in *Paganini*, 2025-Ohio-275 (8th Dist.). A brief review is instructive.

{¶ 32} In *Paganini*, a jury awarded the plaintiff $1,487,500 in noneconomic damages for injuries suffered due to the medical malpractice of his physician. *Id.* at ¶ 11. Under R.C. 2323.43, Paganini was required to "forego 66.4% of the damages awarded to him by the jury in order to lower medical-malpractice insurance rates for the public's benefit." *Id.* at ¶ 50. The *Paganini* court affirmed the trial court's finding that R.C. 2323.43 was unconstitutional as applied to the plaintiff on due process grounds. Relevant to our analysis, the *Paganini* court found, " '[i]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice.' " (Further citation omitted.) *Paganini* at ¶ 65, quoting *Morris*, 61 Ohio St.3d 684 at 691.

{¶ 33} The reduction in noneconomic damages for Lyon is analogous to the plaintiff

in *Paganini*. Here, if the cap is not applied, the appellants are liable for 9 percent of $25,172,526 ($2,265,527). Conversely, if the cap is applied, the appellants are liable for 9 percent of the economic damages plus $500,000 ($965,527).[3] This represents a 57.4 percent reduction in damages "in order to lower medical-malpractice insurance rates for the public's benefit." *Paganini* at ¶ 50. Even more troubling, the statute does not adjust the $500,000 cap for inflation making the recovery significantly less valuable than at the time the statute went into effect. The U.S. Bureau of Labor Statistics indicates that from the time R.C. 2323.43 was enacted, April 2003, the $500,000 noneconomic damages would equate to approximately $286,475.79 today.[4] Given the severity of Lyon's injuries and significance of the reduction of the noneconomic damages, the application of the cap in R.C. 2323.43(A)(3), as applied to this case, is unreasonable and arbitrary.

{¶ 34} The appellants claim that large awards of noneconomic damages are difficult to evaluate. (Appellants' Brief at 29.) While the Supreme Court has made the same general point, *see Arbino* ¶ 69, it reached the opposite conclusion when discussing catastrophic injuries writing that "distinctions the legislature drew in refusing to limit certain injuries were rational and based on the conclusion that catastrophic injuries offer more concrete evidence of noneconomic damages and thus calculation of those damages poses a lesser risk of being tainted by improper external considerations." *Arbino* at ¶ 72. Regardless, even accepting the difficulty in evaluating noneconomic damages generally, given Lyon's age and the severity of her injuries, reducing the noneconomic damages to $500,000 is unreasonable and operates as an arbitrary reduction in damages for a plaintiff that has suffered such extreme and lasting harm.

{¶ 35} For the forgoing reasons, we find that R.C. 2323.43 is unconstitutional, as applied, as it violates Lyon's constitutional right to due process.

### 4. Equal Protection

{¶ 36} Article I, Section 2 of the Ohio Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform, or abolish the same, whenever they may

---

[3] These figures do not include any additional costs and interest.
[4] U.S. Bureau of Labor Statistics, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (accessed Aug. 20, 2025). We note though at the time of publication, the available data only went to April 2025.

deem it necessary; and no special privilege or immunities shall ever be granted, that may not be altered, revoked, or repealed by the general assembly." "Equal protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class." *Morris* at 691, citing *State v. Buckley*, 16 Ohio St.2d 128 (1968).

{¶ 37} Under a facial challenge, we cannot say that R.C. 2323.43 is defective on equal protection grounds. Concerning the rational relationship to a legitimate government purpose, we find much of our discussion regarding the due course of law provision equally applicable to our equal protection analysis. *See Arbino* at ¶ 58 ("In an equal-protection context, . . . we are to grant substantial deference to the predictive judgment of the General Assembly under a rational basis review."). (Citation omitted.) While there may or may not be more effective ways to combat the problem of rising healthcare costs, "the General Assembly is charged with making the difficult policy decisions on such issues and codifying them into law. This court is not the forum in which to second-guess such legislative choices; we must simply determine whether they comply with the Constitution." *Arbino* at ¶ 71. We also find *Morris*, if not binding, highly persuasive on this point. Relying on *Schwan v. Riverside Methodist Hosp.*, 6 Ohio St.3d 300 (1983), the *Morris* court explained that, where there is an equal protection challenge reviewed under the rational-basis test, "the statute must be upheld if there exists any conceivable set of facts under which the classification rationally furthered a legitimate legislative objective." *Morris* at 689, 692. In *Morris*, while the Supreme Court found the prior $200,000 cap on general damages in medical malpractice cases unconstitutional on due process grounds, they "stop[ped] short of finding the statute defective on equal protection grounds, despite the disparate treatment within the class." *Morris* at 692. So too here. Like the statute in *Morris*, R.C. 2323.43 created two classes of plaintiffs: "medical malpractice victims and all other tort victims." *Morris* at 691. Equal protection of the law requires the existence of reasonable grounds for making a distinction between those within and outside the designated groups. *Id.*, citing *Buckley* at 128. Assuming the reality of a crisis in the rising costs of healthcare and medical malpractice insurance, "we do not take issue on equal protection grounds with the legislature's determination to respond as it did with the Act." *Morris* at 691. This court cannot say, beyond doubt, that there exists no set of facts under which the classification of

medical malpractice and all other tort plaintiffs do not rationally further the cited legitimate legislative objective.

{¶ 38} In addition to *Morris*, other state courts have affirmed facial challenges to similar caps on noneconomic damages on equal protection grounds. *See, e.g.*, *McClay v. Airport Mgmt. Servs., L.L.C.*, 596 S.W.3d 686, 696 (Tenn. 2020) (finding, in relevant part, the statutory noneconomic damages cap did not violate, on its face, the equal protection provision of the Tennessee Constitution); *Mayo v. Wisconsin Injured Patients & Families Comp. Fund*, 383 Wis.2d 1, 55 (2018) (finding the $750,000 cap on noneconomic damages in medical malpractice judgments facially constitutional on equal protection and due process grounds).[5] For these reasons, we cannot find beyond doubt that the cap on noneconomic damages to catastrophic injuries in R.C. 2323.43(A)(3) constitutes a violation of equal protection under Article I, Section 2 of the Ohio Constitution.

{¶ 39} We next turn to Lyon's constitutional challenge that, as applied to the facts of this case, R.C. 2323.43(A)(3) violates her right to equal protection guaranteed under the Ohio Constitution. Lyon relies on the Florida Supreme Court case in *N. Broward Hosp. Dist. v. Kalitan*, 2017 Fla. LEXIS 1277 (Fla. 2017). Conversely, the appellants rely on *Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 2009-Ohio-5030 in support of their claim that the statute does not violate Lyon's equal protection rights.

{¶ 40} In *Kalitan*, the Supreme Court of Florida considered the constitutionality of noneconomic damages for catastrophic injuries in medical negligence cases on equal protection grounds. The Florida statute provided a $500,000 noneconomic damages cap for a practitioner's negligence and increases the cap to $1 million for cases involving death, permanent vegetative state, or catastrophic injury "where manifest injustice would occur unless increased damages are awarded." *Kalitan* at *57.[6] The *Kalitan* court found that "the caps on personal injury noneconomic damages in medical negligence actions in section 766.118 violate the Equal Protection Clause of the Florida Constitution." *Id.* at 50. The

---

[5] While *Mayo* found the statute constitutional, both facially and as applied, we note its application is only relevant to the facial challenge. The *Mayo* court, when reviewing the as-applied challenge, utilized a different standard requiring the challenger to "prove beyond a reasonable doubt that as applied to him or her the statute is unconstitutional." *Mayo* at ¶ 55. Because we utilize a clear and convincing standard for as-applied challenges, *Mayo* is distinguishable on this point.

[6] Another provision of the statute sets "a cap of $750,000 in noneconomic damages to a plaintiff who suffers from a nonpractitioner's negligence and increases the cap to $1.5 million in the event of death, permanent vegetative state, or 'catastrophic injury' where a manifest injustice would occur unless increased damages are awarded." *Kalitan* at *57 (Fla. 2017).

Florida Supreme Court reasoned that "it is unreasonable and arbitrary to limit their recovery in a speculative experiment to determine whether liability insurance rates will decrease." (Emphasis omitted.) *Id*. at 58.

{¶ 41} In *Oliver*, the Supreme Court of Ohio considered the facial constitutional challenge to the $250,000 statutory cap on all noneconomic compensatory damages against political subdivisions. *Id*. at ¶ 12. Relevant to the instant case, the *Oliver* court found the statute did not violate the constitutional guarantee of equal protection under the law. *Id*. at ¶ 16. The Supreme Court explained that the statute was rationally related to the legitimate government interest of preserving the fiscal integrity of the political subdivision and could not "say that it [was] arbitrary or unreasonable for the General Assembly to allow *some* recovery in tort actions." (Emphasis in original.) *Id*. at ¶ 15. The Supreme Court in *Oliver* distinguished prior cases like *Morris*, *Sheward*, and *Arbino* based on the award of noneconomic damages against political subdivisions as opposed to private litigants. *Id*. at ¶ 5, 14 ("While those cases suggest that it is arbitrary or unreasonable to impose an across-the-board limitation on noneconomic damages, those cases dealt only with lawsuits between private litigants."). The *Oliver* court noted that it already held that the legislature could have prohibited all tort actions against political subdivisions, *see Menefee v. Queen City Metro*, 49 Ohio St.3d 27, 29 (1990), so it could not say that it was arbitrary or unreasonable for the General Assembly to allow some recovery in tort actions. *Id*. at ¶ 15. We find the instant case more analogous to *Kalitan* than *Oliver*. Unlike *Oliver*, this matter concerns a private litigant and not a political subdivision. Moreover, R.C. 2323.43 is far more analogous to the statutes at issue in *Morris*, *Sheward*, and *Arbino*, making the analysis in *Oliver* largely inapplicable.

{¶ 42} In our examination of R.C. 2323.43 and 2315.18, we are struck by the two classes of plaintiffs encompassed in the statutes: those victims that seek recovery for damages from medical negligence and those who seek recovery for damages derived from other torts. While both statutes place similar caps on noneconomic damages, there is no cap under R.C. 2315.18(B)(3) for noneconomic damages from catastrophic injuries. Conversely, R.C. 2323.43(A)(3) sets a cap on noneconomic damages of catastrophic injuries derived from medical negligence at $500,000. As set forth previously, we recognize the high standard of review at issue with facial challenges and, as set forth in *Morris*, we do not take issue with the General Assembly's efforts to combat the rising costs of healthcare.

However, as applied to the facts of this case, the distinction between Lyon and a nonmedical tort victim seeking a comparable recovery under R.C. 2315.18(B)(3) is clearly and convincingly unreasonable and arbitrary. Under R.C. 2323.43(A)(3), Lyon would be required to accept a 57.4 percent reduction in damages that would not have occurred had her injuries derived from a general tort matter. Thus, Lyon is treated differently based on the nature of her victimization. Unlike *Oliver*, which concerned the cap on noneconomic damages involving political subdivisions, both R.C. 2323.43 and 2315.18 concern claims involving private litigants. Again, even accepting that there might be a rational basis for a cap on noneconomic damages for catastrophic injuries from medical malpractice cases, it is unreasonable and arbitrary that Lyon should be treated differently in this instance than an individual that suffered catastrophic injuries in a nonmedical malpractice context. If Lyon was injured by the appellants in an automobile injury, instead of in the medical negligence setting, she would have been entitled to the full award of noneconomic damages.

{¶ 43} Indeed, a number of Ohio trial courts have considered the constitutionality of R.C. 2323.43(A)(3) and found the statute unconstitutional. *See McNalley v. Keiser*, Lucas C.P. No. G-4801-CI-202303328 (May 19, 2025) (concluding R.C. 2323.43(A)(3) was constitutional on its face but was unconstitutional, as applied, as it violated the plaintiff's due process rights); *Mead v. Wilt*, Franklin C.P. No. 05CV-864 (Mar. 4, 2008) (finding R.C. 2323.43(A)(3) unconstitutional on due process grounds); *Metts v. Nationwide Children's Hosp.*, Franklin C.P. No. 14CV-2543 (Dec. 11, 2018) (concluding R.C. 2323.43 unconstitutional on due process and equal protection grounds); *Haggins v. Biyani*, Franklin C.P. No. 19CV-1804 (July 8, 2022) (finding the statute unconstitutional under the due process and equal protection provisions of the Ohio Constitution); *Sexton v. Medical Oncology/Hematology Assoc., Inc.*, Montgomery C.P. No. 06-785 (Dec. 4, 2009) (concluding R.C. 2323.43(A)(3) is unconstitutional); *Wargo v. Susan White Anesthesia, Inc.*, Cuyahoga C.P. No. CV-08-653779 (Oct. 29, 2009) (finding the statute unconstitutional on equal protection grounds); *Woessner v. The Toledo Hosp.*, Lucas C.P. No. CIO201201614 (May 30, 2014) (holding R.C. 2323.43 violates the due process clause but not the equal protection clause of the Ohio Constitution); *Wells v. Call*, Summit C.P. No. CV 2008-09-6782 (Nov. 23, 2010) (finding R.C. 2323.43 unconstitutional on due process grounds).

{¶ 44} Accordingly, as applied to the facts of this case, R.C. 2323.43 is unconstitutional under the equal protection provision of the Ohio Constitution.

### 5. Right to Trial by Jury

{¶ 45} Lyon reasserts her prior argument that R.C. 2323.43 is unconstitutional as applied to her case because it deprives her of the right to trial by jury. (Appellee's Brief at 48.) The trial court in this case rejected this argument, relying on *Metts*, which held "R.C. §2323.43 does not intrude upon the jury's fact-finding function." (May 31, 2023 Decision and Order at 10.) Lyon has not filed an appeal on this basis. Because we have already found the statute unconstitutional as applied to Lyon on due process and equal protection grounds, we decline to address the right-to-trial-by-jury argument at this time.

{¶ 46} The appellants' sole assignment of error is overruled.

## V.  CONCLUSION

{¶ 47} Having overruled the appellants' sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON, P.J., and BEATTY BLUNT, J., concur.

———————————————